MICHAEL C. FASANO (*pro hac vice to be filed*)
mfasano@fasanolawfirm.com
FASANO LAW FIRM, PLLC
2 S. Biscayne Blvd., Suite 1750
Miami, FL 33131
Telephone: (786) 530-5239
Facsimile: (954) 688-2492

ARASH SADAT (SBN 279282)
arash@sadatlawgroup.com
SADAT LAW GROUP
333 South Hope Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 613-9434
Facsimile: (213) 613-0550

Attorneys for Plaintiff
LUIZ MUSSNICH

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUIZ MUSSNICH, an individual,<br><br>Plaintiff,<br><br>v.<br><br>RODRIGO TEIXEIRA, an individual; RT FEATURES U.S., LLC, a Delaware limited liability company; US ONE COMERCIO E SERVIÇOS DE CRIAÇÃO E PRODUÇÃO DE OBRAS COM DIREITOS AUTORAIS, S.A., a Brazilian corporation; RT COMÉRCIO E SERVIÇOS DE CRIAÇÃO E PRODUÇÃO DE OBRAS COM DIREITOS AUTORAISM LTDA., a Brazilian limited liability company; CAMISA TREZE CULTURAL SS LTDA., a Brazilian limited liability company; JOSEPH B. GUES, an individual; J.G. BUSINESS MANAGEMENT, INC., a California corporation; [continued on next page] | Case No.<br><br>**COMPLAINT OF PLAINTIFF LUIZ MUSSNICH** |

1    LEONARDO MAIA, an individual; and
     DOES 1 THROUGH 10, INCLUSIVE,
2
3                   Defendants.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Luiz Mussnich ("Mussnich" or "Plaintiff"), by and through his undersigned counsel, and for his Complaint against Defendants Rodrigo Teixeira ("Teixeira"), RT Features US, LLC ("RT"), US One Comercio e Serviços DE Criação e Produção de Obras Com Direitos Autorais, S.A. ("US One"), RT Comércio e Serviços DE Criação e Produção de Obras com Direitos  Autoraism Ltda. ("RT Comercio"), Camisa Treze Cultural SS Ltda. ("Camisa Treze"), Joseph B. Gues ("Gues"), J.G. Business Management, Inc. ("J.G. Business"), Leonardo Maia ("Maia"), and Does 1 through 10, inclusive (collectively, "Defendants"), hereby states as follows:

## PARTIES

1.      Plaintiff Luiz Mussnich is a citizen of the Federative Republic of Brazil.

2.      Defendant Rodrigo Teixeira is a citizen of the Federative Republic of Brazil.  Upon information and belief, Teixeira frequently travels between Brazil and Los Angeles County, California and operates several businesses from California, including RT Features US, LLC.

3.      Defendant RT is a Delaware limited liability company with a registered agent in Santa Monica, California.  The company's member is Rodrigo Teixeira.  Upon information and belief, Rodrigo Teixeira is the company's sole member.

4.      Defendant US One is a Brazilian corporation and upon information and belief owns, or has owned, RT Features US, LLC.  Upon information and belief, US One is controlled by Teixeira.

5.      Defendant RT Comercio is a Brazilian affiliate of RT that is, upon information and belief, controlled by Teixeira.

6.      Defendant Camisa Treze is a Brazilian affiliate of RT that is, upon information and belief, controlled by Teixeira.

7.      Defendant Joseph B. Gues is, upon information and belief, a resident

of Los Angeles County, California.  Gues is a certified public accountant practicing in the State of California.

8.     Defendant J.G. Business is a California corporation based in Malibu, California.  Upon information and belief, J.G. business is owned and controlled by Joseph B. Gues.

9.     Defendant Maia is a citizen of the Federative Republic of Brazil.  Maia serves as the Chief Financial Officer of RT and the RT-related entities managed and controlled by Teixeira.

10.     Plaintiff is unaware of the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, and therefore sues these defendants by fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities when the same have been ascertained.  Plaintiff is informed and believes and, on that basis, alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged and that Plaintiff's damages were proximately caused by said defendants' conduct.

## JURISDICTION AND VENUE

11.     The Court has original jurisdiction pursuant to 28 U.S.C. § 1331, because questions of federal securities law predominate the asserted claims.

12.     The Court has personal jurisdiction because the Defendants committed tortious acts within this judicial district and Defendant RT is a company conducting business with a registered agent in this judicial district.  Pursuant to 28 U.S.C. § 1391, venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

## I.     INTRODUCTION

13.     Rodrigo Teixeira is a self-proclaimed film producer who operates a Los Angeles-based production company by the name of RT Features US, LLC ("RT"), and network of other companies in the United States and Brazil that

purport to engage in the business of film production in the United States.  RT has shared producer credits on some critically acclaimed films, including the Academy Award winning film *Call Me By Your Name*.  RT operates a website in English and Portuguese with web address https://rtfeatures.com.br.  The website describes RT's business as follows:[1]

> With over 20 people working across the board on development, production, post production, sales, marketing, accounting and foreign language projects, the company multiplies, matures and become ever more united on each and every project.

> The website also described Rodrigo Teixeira, the owner of RT and its creative visionary:

> "The IP's freak", "The producer who believes he'll conquer the world", "The Brazilian infiltrated in Hollywood". Many expressions have been attributed to Rodrigo Teixeira.

> [. . .]

> The connection amongst [Orson Welles' Citizen] Kane, the Corleones [of The Godfather trilogy] and Rodrigo happens not only through an idea of *megalomania* (after all, that's part of a producer's life) but mainly and foremost by his dedication and passion on everything he does.

(emphasis in original).

14.     The self-proclaimed "megalomaniac" Hollywood producer places his name amongst the greatest filmmakers in United States history; however, as stated herein, the "IP's Freak" description is more appropriate, as Teixeira's business model appears to be to constantly raise funds from new investors for entertainment-related projects promising high returns and an opportunity to be part

---

[1] The quoted text appears as it is found on the website.

of Teixeira's artistic vision, which as described below is not an artistic vision at all, but rather a shell game involving intellectual property rights rather than traditional stocks, bonds, or debt instruments. Teixeira then, upon information and belief, takes those funds, co-mingles them for various business and personal expenses, does not account to investors, makes extraordinary excuses for failure to even account to investors, and then only pays certain investors back when those investors threaten legal action against him.

15. Before Teixeira was being honored at film festivals and in Variety Magazine's prestigious "Variety 500" for serving as a producer on critically-acclaimed, but supposedly not profitable films, which Mussnich now believes to be a lie, he was going around Brazil raising money to buy and sell intellectual property rights for various film and non-film related projects.

16. In 2009, Teixeira met Plaintiff Luiz Mussnich, a successful investment professional, with a strong reputation for managing finances for high-net-worth individuals and family offices. Mussnich himself, is from a highly respected Brazilian family, and uses his strong reputation and network to find diversified investment opportunities for his clients around the world. Believing in the legitimacy of Teixeira and the representations he made about the projects he was involved in and about the guarantees Teixeira made as to the future success for the projects, Mussnich introduced Teixeira to his network of wealthy friends, colleagues, and clients at Teixeira's insistence.

17. Through Teixeira's and RT's fraud, which was only discovered by Mussnich after several complaints began flooding in from investors as Mussnich learned that Teixeira never gave any information to investors relating to films and never performed under his agreements, Mussnich has been seriously damaged reputationally as Teixeira exploited Mussnich's business partners, wealthy Brazilian families, and even Mussnich's own family to obtain tens of millions of dollars in what turned out to be worthless investments.

-4-

18.     Mussnich brings this action after trying to salvage his relationships with his friends, colleagues, and clients who were charmed by Teixeira and became investors in his so-called projects and have never obtained answers from Teixeira and RT about their investments.

19.     Moreover, Mussnich has recently learned that lawsuits are being filed in Brazil against Teixeira and RT, further jeopardizing his reputation as a reliable business advisor who represents serious professionals in the investment community and with his current and former business partners.

## II.     THE "IP'S FREAK"

20.     Mussnich was introduced to Teixeira for the first time in 2009 through a mutual contact[2] who had already loaned funds to one of Teixeira's ventures.  At that time, Teixeira was not interested in raising funds for his stated passion of film, rather he was attempting to buy the publishing rights for a book about a famous Brazilian singer named Tim Maia.

21.     Teixeira explained that he needed to raise money quickly to capitalize on the potentially lucrative opportunity.

22.     Mussnich was asked to quickly find an investor for Teixeira, the daughter of an important client and business contact, who was very interested in the project relating to Tim Maia.  Teixeira appeared in a hurry to obtain the funds, so Mussnich acted quickly.  Mussnich first structured the investment as a loan and then suggested that Teixeira and the investor proceed without his further involvement.  Teixeira then later convinced the investor to convert the loan into an equity investment.

23.     Mussnich recently learned that Teixeira had also solicited other investments from this investor (including investments with RT), and that the

---

[2] The mutual contact ended up constantly pressuring Teixeira for three years until the investment was finally paid back.  The client received no indication as to the performance of the intellectual property rights in which he invested and no information about how the investment was suddenly paid back.

investor did not receive accountings, regular payments, and that most of those capital investments, or refinancing agreements relating to those investments remain unpaid.

### III.   THE PRODUCER WHO BELIEVES HIS OWN PUBLIC RELATIONS

24.   Shortly after Mussnich worked with Teixeira to find an investor for the Tim Maia publishing rights, Teixeira began telling Mussnich that he had a great understanding of the movie business in the United States, specifically in California. Teixeira told Mussnich that he owned a production company, RT, in the United States and that Teixeira could produce "preferred returns" to investors and then even greater returns on the profits from investing in motion pictures.

25.   Intrigued, and without knowledge of Teixeira's true intentions and business practices, Mussnich agreed to assist Teixeira and RT by introducing to Teixeira his friends, colleagues, and clients who may be interested in investing in various film projects to be produced and distributed in the United States through RT. Mussnich did not charge a fee to RT or Teixeira for those services as Mussnich believed the investments, as described by Teixeira, would benefit his clients and network, and that the relationship with RT would grow.

26.   Mussnich, who was at the time a partner in a Multi-Family Officer ("MFO"), providing business, investment, and consulting services to ultra-high-net-worth individuals in Brazil, even introduced Teixeira to his partners in the MFO.

27.   The partners of the MFO were accustomed to placing their clients' funds in highly liquid investments for long-term wealth preservation, but they met with Teixeira to explore the "new" type of investment security he was offering, enticed by "guarantees" Teixeira would make about returns on investment.

28.   Teixeira explained to the MFO that he could produce very high returns by investing in various film projects on a project-by-project basis through his production company, RT. Teixeira touted, even at that time, that he had

relationships and ongoing ventures with "Hollywood icons" who were working with Teixeira, RT, and RT's Brazilian affiliates to ensure an especially high probability of success.  Now, Mussnich understand those statements to be complete lies.

29.     Teixeira explained that investors could have flexibility by investing only in the projects they believed in, and that they could obtain a preferred return on capital and, thereafter, high returns from those projects based on box office receipts.  Teixeira ensured that RT would manage the process on their behalf and remit profits to the investors.  Teixeira ensured investors that Joseph Gues, RT's accountant in California, would be keeping track of and managing the investment monies as they were being deployed on different projects.

30.     Intrigued by the prospect of high returns and Teixeira's assurances that the investment risk was mitigated by his stated expertise in intellectual property management and the United States film industry, the Mussnich's partners in the MPO became intrigued.

31.     One of Mussnich's former partners decided to invest approximately $1,000,000 in various film development agreements with Teixeira and RT.

32.     Separately, and without telling Mussnich, Teixeira engaged in several private meetings with Mussnich's other MPO partner at the time.  That former partner not only invested his own money into RT film productions, but also made several loans to RT directly in the United States. That partner, as Mussnich previously did for Teixeira, also introduced Teixeira and RT to several other prominent Brazilian investors.  Upon information and belief, Teixeira and RT raised millions of dollars from Mussnich's partners for various film projects.  As described in more detail below, Mussnich came to learn that RT, its Brazilian affiliates, and Teixeira were not using those funds for specific projects, but rather were likely engaging in a complex fraud.

33.     While working with one of Mussnich's partners to further develop his investor network, Teixeira came back to Mussnich to raise additional funds for additional projects.  It appeared that Teixeira's and RT's investment offerings were virtually unlimited and that the company was always in need of capital to pursue new opportunities.  At the time, Mussnich saw this as a positive sign and had no reason to doubt Teixeira, RT, and its Brazilian affiliates.  The projects were sold as medium to long-term investments as the films needed to be produced and released before RT would realize profits for investors.  To stave off questions from investors, Teixeira would offer plausible explanations including that RT and Teixeira were negotiating with cast members for a specific production, that RT was negotiating with screenwriters, and other "movie business" matters that could not be readily verified by investors.

34.     Mussnich thereafter introduced Teixeira and RT to one of his most important clients, the scion of one of Brazil's most successful financial families.  Teixeira did not waste any time raising money.

35.     Teixeira presented a dual investment strategy.  He would diversify the client's investment with RT and its Brazilian affiliate by offering the client a high-interest loan from RT to provide regular income and a capital investment in film production projects.  In hindsight, this was not a strategy, but Teixeira using any method possible to continue raising money to pay off prior debts.  The client agreed and made both investments.

36.     In all, Mussnich knows of over 15 wealthy and prominent individuals or companies that he directly or indirectly introduced to Teixeira and RT who either loaned money or made capital investments in film projects.

## IV.     THE MEGALOMANIAC

37.     With Mussnich's assistance and the assistance of his family, friends, clients, and business partners, Teixeira raised enough funds to become producer or co-producer on numerous films.  Teixeira's personal IMDb.com page indicates that

-8-

from 2009 through 2020, Teixeira and his company RT have been involved in the production of 48 films and television shows. The majority of those productions were low budget independent films produced in conjunction with other studios. Coincidentally, this was during the period where Mussnich was consistently raising money for RT and Teixeira.

38.     Because the time from a film's development through its production and full commercial exploitation can take many years, Teixeira and RT had the luxury of ensuring its investors that the projects were going smoothly and that the films would eventually produce the strong returns that Teixeira promised his investors.

39.     In 2018, RT had what its investors believed was a major breakthrough.  One of the films that several of Mussnich's clients invested in, *Call Me By Your Name*, won Best Writing Adapted Screenplay at the 90th Academy Awards, and was nominated for Best Picture, Best Original Song, and Best Actor. *Call Me By Your Name* also won many other awards from different respected organizations.

40.     With the critical success of *Call Me By Your Name*, RT, and Teixeira's public profile, especially in the United States elevated rapidly.  For example, Teixeira's success during the 2018 Hollywood awards season earned him a place in the "Variety 500", Variety Magazine's "index of the 500 most influential business leaders shaping the global $2.2 trillion media industry."

41.     After this apparent success, RT's investors expected the big payoff, not only for their patient investment in *Call My By Your Name*, but in the many other projects in the RT catalog that investors from Mussnich's network invested in over several years.  Unfortunately, this did not occur.

//

//

//

## V.   MUSSNICH IS TOLD THAT RT AND TEIXEIRA ARE UNAPOLOGETICALLY RUNNING A PONZI SCHEME

42.     After RT's high-profile acclaimed success in *Call My By Your Name*, many of its investors began asking for financial information relating to their portion of RT's profits from its films.  This information was not forthcoming.

43.     As Mussnich would come to learn, Teixeira and RT began delaying and making excuses to its many investors as to why it could not, or in some cases, would not produce financial data relating to the company's various projects, even after several of those projects were produced and were being commercially exploited through major industry distributors.  Teixeira's and RT's investors became frustrated because they were also not being paid or being provided with any expectation of when they would be paid.  Teixeira's practice became to postpone payments weekly, every week, *ad inifinitum*.

44.     Mussnich also came to learn that several investors he introduced to Teixeira through his network were threatening legal action against Teixeira, RT, and its affiliates in the United States and Brazil.  When investors would seriously threaten Teixeira, he would suddenly offer that investor money in the form of a settlement to essentially go away and relinquish any rights to inspect the books and records of RT.  To date, Mussnich believes that more than 10 investors introduced to Teixeira and RT directly or indirectly by him were paid settlements to avoid legal action and accountings.

45.     Eventually, Teixeira's and RT's conduct got back to Mussnich as several of Mussnich's most important business contacts, partners, and clients began seeking answers from *him* relating to Teixeira's and RT's conduct.

46.     Mussnich was shocked.  At that time, he had left the MFO to serve as a personal financial advisor to his most prominent client's family exclusively (who, as described above, invested with Teixeira, RT, and its Brazilian affiliates). RT and Teixeira had made payments on the loan given by Mussnich's client, but

1   Teixeira did not offer any information or payment relating to the client's capital
2   investment.

3       47.     Mussnich confronted Teixeira personally several times about the lack
4   of information about his client's film development investment, which Mussnich
5   and the client believed had paid off.  Teixeira—unbelievably—told Mussnich that
6   his client had made a "bad deal" by not negotiating for audit rights or rights to
7   periodic accountings in her development agreement.  Teixeira subtly threatened
8   Mussnich stating that he had consulted with lawyers and that if Mussnich took any
9   legal action on behalf of his client, he would certainly lose.

10      48.     To date, RT and Teixeira refuse to provide Mussnich's client with any
11  financial information about its investments with RT and its Brazilian affiliate.  The
12  client has also not received any return on capital.  Teixeira takes the position that
13  the client is not entitled to know how the contributed funds have been used.

14      49.     Mussnich then began retracing his steps, speaking with RT investors
15  who he introduced to Teixeira.  Their stories were nearly identical.  Teixeira and
16  RT were either very delinquent on loans or had refused to account or provide any
17  return on capital investments in RT's various projects.  The most aggressive
18  investors who threatened legal action would be offered buyouts of their
19  development agreements.  Investors who trusted Teixeira and waited patiently
20  received nothing.

21      50.     Mussnich learned that the first investor he introduced Teixeira to in
22  2009, the daughter of a close friend and business client, received limited
23  information regarding her investments and sporadic returns that did not appear to
24  be tied to any performance.  It is unclear whether RT has provided a justification as
25  to how it lost that client's funds.

26      51.     Mussnich then learned that one of his former partners in the MFO was
27  owed approximately $1,000,000 by RT and its Brazilian affiliates.  The former
28  partner apparently called Teixeira personally several times to understand the status

of his investment.  The former partner described Teixeira's explanations as "absurd excuses" for non-payment.

52.     Mussnich learned that his second former partner lent funds to RT and its Brazilian affiliates and that the loan was so severely impaired that the interest owed exceeded the amount of the initial principal.  Mussnich is unaware if legal action has been taken relating to this transaction.

53.     Mussnich learned that RT and its affiliated companies had hired Maia, a financial professional from Brazil, to act as RT's Chief Financial Officer.  When Mussnich explained the situation, Maia appeared to freely admit that Teixeira's pattern put Maia in difficult situations with clients, as the company made commitments to pay investors on projects that RT and its affiliates could not actually pay.  Maia admitted that RT and its affiliates would take available cash from other projects from other investors to honor those commitments.  In short, RT would raise money from investors for a particular film project knowing that it needed capital to make payments on its various loan agreements with other investors: RT would then take the new investors' money and use it to either buy out prior investors or to make payments on its loans to avoid default and exposure of the scheme.  This is the definition of a ponzi scheme.  RT did not disclose that it was raising capital to refinance or pay down debt.  Investors believed they were investing in movie production deals in the United States.

54.     Maia continues to work with Teixeira and regularly communicates with investors, lying to them about the status of their investments on behalf of Teixeira, by promising updated information and arranging payments to old investors with, upon information and belief, new investor capital.

55.     Unbelievably, Joseph Gues, the accountant for RT and Teixeira in the United States admitted to Mussnich in an in-person conversation in LA that RT and Teixeira maintained similar accounting practices as those acknowledged by Maia.  Gues told Mussnich that Teixeira and RT would *routinely* settle cases with

disgruntled investors by taking investor funds allocated for other projects to fund the settlement. Teixeira, with the assistance of Maia and Gues, would move investor funds from projects that Teixeira knew in advance would not be produced and would ultimately be failures, to accounts related to the disgruntled investor's project. It became clear to Mussnich that Gues and later Maia were following the instructions of Teixeira, who blatantly sought to defraud his investors and cover that fraud up using bookkeeping maneuvers.

56.     Gues admitted to Mussnich in person while in Los Angeles that RT would regularly arrange its books and records to make it appear that RT had legitimate expenses to justify its flow of funds.

57.     Teixeira, Gues, and Maia willfully concealed the fraudulent scheme.

58.     Mussnich, a financial professional, has been severely damaged by RT's and Teixeira's deceptive and tortious conduct, damaging Mussnich's long-standing valuable business relationships, relationships with former and current business partners, relationships with his own clients, as well as family and friends. Mussnich, through his own investigation, has come to learn that Teixeira is not an artist or a producer of independent films, but rather a self-styled intellectual property "broker" who has discovered an ideal vehicle to accept investors' money, hold it for long periods of time without suspicion, and then raise more money later to settle claims with earlier investors. Teixeira also refuses to produce clear and professional accounting statements so it is unclear how much he or RT spend during the long "development" periods for RT's films or how much any investor is actually owed.

## VI.     TEIXEIRA'S ADMISSIONS OF FRAUD IN FOREIGN LAWSUITS

59.     Mussnich has become aware of multiple lawsuits that have been filed against Teixeira, RT, and its Brazilian affiliate in 2020. Like with all such schemes of this nature, it now appears that Teixeira has run out of excuses and time to continue to duck and dodge his investors.

-13-

60.     As part of his delay tactics, Teixeira has made outrageous excuses and damning admissions of his conduct.

61.     For example, in a lawsuit in Brazil with an investor relating to a 2016 investment, Teixeira admitted that he did not maintain separate accounting for different films and that Sony Picture Classics, the studio he most prominently worked with, did not perform accounting services for RT, so Teixeira, RT, and its Brazilian affiliates just didn't maintain accounting for its investors. To wit, Teixeira admits:

> there was never a formal existence of the [production investment] and distinct accounting was never maintained, nor a bank account or a National Registry of Legal Entities (CNPJ – a personal legal entity) to declare income tax - not least because he did not earn any income, given, to repeat emphatically, there never was any money inflow. . . . A film producer, although having an entrepreneurial bias, he is, above all, an artist and formality is not usually the central feature of artists.

62.     Moreover, Teixeira admitted in that Brazilian lawsuit that the film the investor put his money into resulted in a total loss, but that Teixeira, to avoid detection that he was running a Ponzi scheme, made two different payments to the investor in 2018 and 2019 respectively with funds from other companies within the RT "group" of companies, even though, according to Teixeira, he owed the investor no money and the film at issue was completely unprofitable:

> The interesting thing to know - indeed, very interesting, and even admittedly difficult to believe, had it not been for the documentary evidence produced here – is that [the investor] received money for his participation in [the film]: a payment of R$163,340.00 on September 6, 2018, and R$72,300.00 on August 3, 2019, thus totaling R$235,640.00 [] - that is, the author, who was quiet in his initial regarding this fact, recovered almost all of his investment.

-14-

(emphasis in original).

63.     Unbelievably, Teixeira made this admission about the failure of the 2016 investment, which he considered a "disaster," after inducing the same investor to invest more than $1.5 million late 2017 and 2018 into the same or similar projects.

64.     Moreover, in *another* investor lawsuit filed in Brazil, which Teixeira quickly settled, Teixeira admitted that he failed to pay an investor who, according to Teixeira's "accounting" (which he simultaneously says does and does not exist), was owed over $300,000, and instead decided to pay a different investor first to avoid that investor, who was owed much more money, from uncovering his scheme.

65.     At this point, Teixeira, his US accountant, and his Brazilian accountant, have admitted, and in Teixeira's case in writing and in a court of law, that RT, Teixeira their Brazilian affiliates are nothing more than a shell game meant to enrich Teixeira, allow him to maintain the illusion that he is a rich and famous "Hollywood producer," when he is really an investment fraudster.

## FIRST CAUSE OF ACTION

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Teixeira and RT

66.     Mussnich repeats and realleges paragraphs 1 through 65 as if fully set forth herein.

67.     Defendants Teixeira and RT disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68.     Defendants Teixeira and RT: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to

-15-

state material facts necessary to make the statements not misleading; and (c)
engaged in acts, practices, and a course of business which operated as a fraud and
deceit upon the purchasers of fractional interests of development agreements
offered by the Defendants, which qualify as investments in securities under United
States law.

69.     Mussnich has suffered damages in that, in reliance on the Defendants
Teixeira's and RT's statements, as he was induced to participate in a scheme to
defraud investors in the purchase and sale of what can be classified as securities
under United States law.

70.     As a direct and proximate result of Defendants Teixeira's and RT's
wrongful conduct, Mussnich suffered damages in connection with the Defendants'
scheme.

71.     The conduct of Teixeira and RT constitutes malice, oppression, and
fraud and therefore entitles Mussnich to an award of punitive damages.

## SECOND CAUSE OF ACTION

### Fraud Against Teixeira and RT

72.     Mussnich repeats and reallege paragraphs 1 through 65 as if fully set
forth herein.

73.     As stated herein, Teixeira, in his personal capacity and on behalf of
RT, made materially misleading statements to Mussnich, to wit, that he was
assisting RT in the United States and Brazil to raise money from investors for
legitimate participation rights in the development of specific motion pictures.

74.     RT and Teixeira knew that these representations were false when
made as RT and Teixeira were running a perpetual Ponzi scheme where they
would pay old investors who threatened to take legal action with new investor
money.  During this time, Teixeira and RT hid and obfuscated its financial
condition and the use of its funds from its investors to support the lifestyle,
professional development, and personal projects of Teixeira.  Upon information

and belief, several of the films Teixeira and RT raised money to develop were never seriously pursued and RT and Teixeira retained the funds indefinitely for their own purposes.

75.    RT and Teixeira acted with intentionality and malice over the course of years when making those false representations.

76.    Mussnich reasonably relied on RT's and Teixeira's false representations and used his professional network to raise millions of dollars for RT in the United States and Brazil.

77.    Mussnich has sustained damages as a result of RT's and Teixeira's conduct.

78.    The conduct of Teixeira and RT constitutes malice, oppression, and fraud and therefore entitles Mussnich to an award of punitive damages.

## THIRD CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

### Against Teixeira and RT

79.    Mussnich repeats and reallege paragraphs 1 through 65 as if fully set forth herein.

80.    Over the course of years, Mussnich developed numerous economic relationships that were beneficial to him.

81.    Teixeira and RT, as stated herein, were aware of these relationships.

82.    As stated herein, the Teixeira and RT committed independent wrongful conduct as described in the complaint, and Teixeira and RT knew that their fraudulent scheme would disrupt Mussnich's closest business and personal relationships.

83.    Teixeira and RT, by their conduct, did in fact disrupt those relationships.

84.    Teixeira's and RT's conduct caused Mussnich to sustain damages.

85.    The conduct of Teixeira and RT constitutes malice, oppression, and

1    fraud and therefore entitles Mussnich to an award of punitive damages.

2    ## FOURTH CAUSE OF ACTION

3    **Negligent Interference with Prospective Economic Advantage**

4    **Against Teixeira and RT**

5    86.    Mussnich repeats and realleged paragraphs 1 through 65 as if fully set

6    forth herein.

7    87.    Over the course of years, Mussnich developed numerous economic

8    relationships that were beneficial to him.

9    88.    Teixeira and RT, as stated herein, knew or should have known of

10   those relationships, and knew or should have known that their conduct would

11   disrupt those relationships by failing to act with reasonable care.

12   89.    As stated herein, Teixeira and RT committed independent wrongful

13   conduct as described in the complaint, and the Defendants knew that their

14   fraudulent scheme would disrupt Mussnich's closest business and personal

15   relationships.

16   90.    Teixeira and RT, by their conduct, did in fact disrupt those

17   relationships.

18   91.    Teixeira's and RT's conduct caused Mussnich to sustain damages.

19   ## FIFTH CAUSE OF ACTION

20   **Conspiracy to Commit Fraud Against US One, RT Comercio, Camisa Treze,**

21   **Gues, J.G. Business, and Maia**

22   92.    Mussnich repeats and realleged paragraphs 1 through 65 and 72

23   through 78 as if fully set forth herein.

24   93.    Defendants US One, RT Comercio, Camisa Treze, Gues, J.G.

25   Business, and Maia (the "Co-Conspirators"), as alleged herein knowingly worked

26   directly with Teixeira and RT to maintain an elaborate multi-million-dollar

27   international Ponzi scheme.

28   94.    Teixeira and RT used US One, RT Comercio, and Camisa Treze as

-18-

vehicles in Brazil to raise funds that would be co-mingled into Teixeira's scheme to defraud investors.  Teixeira used those companies interchangeably with RT in the United States to confuse investors and perpetuate a massive fraud that is now being unraveled.  Gues and Maia, between Brazil and California, managed the books and records of those companies, taking affirmative steps to perpetuate and conceal the fraud.

95.    Maia and Gues, separately, admitted the fraud to Mussnich, with Gues confirming that he knew of and assisted RT and Teixeira in falsifying business records to make payoffs to disgruntled investors seem like normal course "movie business" payments.  Moreover, Maia and Gues knew that Teixeira was raising money for films that he never intended to make and that were being used as vehicles to simply pay off prior disgruntled investors.

96.    These overt acts were repeated over 48 alleged film production and development projects.

97.    Co-Conspirators' conduct caused Mussnich to sustain damages.

98.    The conduct of US One, RT Comercio, Camisa Treze, Gues, J.G. Business, and Maia constitutes malice, oppression, and fraud and therefore entitles Mussnich to an award of punitive damages.

## SIXTH CAUSE OF ACTION

**Aiding and Abetting Fraud Against Gues, J.G. Business, and Maia**

99.    Mussnich repeats and reallege paragraphs 1 through and 72 through 78 as if fully set forth herein.

100.    By their own admissions, Gues and Maia knew that Teixeira and RT were defrauding investors through an elaborate Ponzi scheme.

101.    Gues and Maia, as stated herein, gave substantial assistance, and continue to give substantial assistance to Teixeira and RT in perpetrating the fraudulent scheme.

102.    As finance and accounting professionals, Gues and Maia gave

-19-

substantial assistance to Teixeira, who has no background in finance, and RT by lying to investors, withholding and concealing company records, and affirmatively altering the books and records of RT to conceal a massive fraud.

103. The conduct of Gues, his company J.G. Business, and Maia caused Mussnich to sustain damages.

104. The conduct of US One, RT Comercio, Camisa Treze, Gues, J.G. Business, and Maia constitutes malice, oppression, and fraud and therefore entitles Mussnich to an award of punitive damages.

<u>**SEVENTH CAUSE OF ACTION**</u>

**Negligence Against All Defendants**

105. Mussnich reincorporates paragraphs 1 through 65 as if fully set forth herein.

106. At all times Defendants owed Mussnich a duty of care to treat he and his clients fairly, not to deceive Mussnich into making introductions that would hurt his reputation, and not to provide Mussnich with false information.

107. Defendants breached these basic duties to Mussnich.

108. Defendants' breaches caused Mussnich to sustain damages.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Mussnich prays for judgment against Defendants and each of them, as follows:

A. An award of actual damages in an amount to be proven at trial.

B. On the first, second, third, fifth, and sixth causes of action, an award of punitive damages in an amount sufficient to punish Defendants their malicious, oppressive, and fraudulent conduct.

C. An award of pre-judgment and post judgment interest.

D. An award of costs of suit incurred herein.

E. Such other relief that the Court deems just and proper.

//

1

## **JURY TRIAL DEMANDED**

2

Mussnich demands a trial by jury on all claims so triable.

3

Dated:  October 21, 2020                              SADAT LAW GROUP

4

5

By:  _____ */s/ Arash Sadat* __ _____

6                                                                     Arash Sadat

7                                                            Attorneys for Plaintiff

8                                                            LUIZ MUSSNICH

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-21-